May it please the Court, good afternoon. I'm Jim Swanson. I represent the plaintiffs' appellants in this case. I assume the panel is well familiar with the factual issues that are contained in the record, so I'm going to hit on what I believe to be the two main points of our argument this afternoon. Before you start. Yes, sir. I think I know the answer to this, but I just want us to have it very clear for the panel and for our recording of this. The only issue you're raising here is the lost business value damages, correct? You're not seeking lost profits. You're only seeking lost business value damages. That is correct, Your Honor. Thank you. Yes, and that gets right to the heart of the question. At the motion-filing deadline, the defendants filed a number of motions, dispositive motions, Daubert motions, et cetera, as is kind of standard these days in a case like this. Ultimately, the district court ruled that with respect to our claims for economic damages, he believed those claims were too speculative to be presented to the jury and dismissed them. That's the sole issue here today on appeal. In doing so, the district court said that the fact that we were asserting lost business value damages as opposed to lost profits damages was a distinction without a difference under the facts of the case, and in doing so, the judge indicated or he didn't make any comment whatsoever on the fact that we had as part of our evidence and a critical part of our evidence an actual term sheet from an experienced and well-financed private equity firm for the business at the time of the breach. And on that term sheet, there's not a — what is the amount supposedly that would have been offered? What the term sheet was an offer to do was to finance the project, and so in order to figure out what that meant, you'd have to go back and look at the pro formas at the time. The offer was at the project cost at the time, based on what was a — Did they give a fixed figure? It didn't in the term sheet. That's what I understood. There's no fixed amount given on the term sheet. No, there isn't. But if you go and look at the evidence in the record, including the pro formas they were looking at, you can see that the construction cost was estimated at the time to be $106 million. How do we link that from the term sheet to the pro formas? Is there some link? Something in the term sheet saying we're going to finance certain functions? I just don't follow how you go from a term sheet to the pro formas and help us do the math. Yeah. The way you would do the math is what you'd have to look at to determine that are four things. The first thing you'd have to look at is the term sheet itself. The second, you'd have to understand the financial figures that were exchanged between the parties at the time, which are part of the record. The third thing that you'd need to know is you'd have to look at the expert report of Legacy Capital. Legacy Capital was the investment banking firm that was providing the expert witness testimony on lost business value in the case. And finally, you'd have to look at the other documents and the testimony of Luke Taylor, which is in the record. If you looked at all four of those things, you could determine what that value was, but you make a good point that the dollar figure was not listed in the offer itself, although I submit to you that if you look at the record, you could divine what that dollar figure is quite easily and readily. If you look at the Legacy Capital report that's in the record, towards the end of it, there's a section that discusses in detail the Stone Peak offer and what it means. Now, some of that is a translation, sort of an investment banking translation of what that term sheet means in real dollar terms, but I think that it substantiates the $106 million figure pretty readily. Would I be wrong in thinking, if we're looking, you're applying a Phillips reasonable certainty standard, the Stone Peak proposal isn't an actual offer, it isn't a current interest, so it would require the reasonable jury to then know the permits were going to occur, the engineering was going to occur, the financing. In other words, let me put that into a question. What case after Phillips in Texas draws an equivalency between the offer that was real in Phillips and the Stone Peak proposal, or is your argument that there's a dispute of fact contingent on the Legacy report's interpretation of the proposal? I think that the answer to that is that the offer that we have in this case is very similar to the offer that was on the table in the Phillips case, which was also an offer and it was ultimately not a consummated offer. And there are a number of cases, and we cited several other ones in our brief, where an offer can be evidence of value that the jury can consider in order to determine the damages. In this case, I think, because of the nature of what you said about the Stone Peak offer, you would need to be able to do that, you would need to have the Stone Peak offer and then you'd need to have the testimony of the expert witness, the Legacy capital people who deal in private equity deals all the time and they can understand when it says, we're making an offer to finance this project, what that means. I mean, if you make an offer to finance a project, what it means is that you are making an offer to finance the estimated cost of the project. And by that time, there was a not-to-exceed bid for the project upon which all that information was based. So, I think that . . . The District Court doesn't mention the Legacy report? The District Court doesn't mention the Stone Peak proposal. But it also doesn't mention . . . Mention the Legacy report. Their brief says that you didn't urge it, that you forfeited reliance on the Legacy report to create a dispute of fact. Do you recall that statement? I do recall that statement in the brief. To me, it's a puzzling statement because right in our response to the motion is an argument about the Stone Peak offer and the Legacy report. They're both contained right in there. And I don't have record sites up here with me, but I could get you record sites for that. The report's about 70 pages long. There are multiple different damage models. Do all three depend on the Stone Peak proposal or not? No, they don't. And they really aren't three separate models. They're very similar, actually, to the report that was in the Wellogix case because what the . . . But since I was on that panel there, you actually had a venture capital investment of $8 million for a 30% interest. That looks identical to Phillips to me, whether I was right or wrong in being on that panel. But here it is. To me, it isn't the offer itself. I just keep thinking it's much more contingent on things happening. And the term sheet Stone Peak gave stated the same. But I'm very troubled by, from the standpoint . . . this is a softball question to you, that the legacy reports out there, there is no Doe-Bear inquiry even given to it. It's not even mentioned. And yet it would seem to me a damage expert that's extrapolating value. Correct. I would agree with that. The legacy report, what the legacy report did is it did really three different things, really four things. And they all combined to come to the first is what we've been talking about, the Stone Peak term sheet. It interprets what the Stone Peak term sheet does and converts that into a dollar figure. It also contains an analysis of comparable public companies, public entities that are in the same business, analyzes their . . . and corroborates the Stone Peak offer. I didn't understand, I'm not great with finance, but why would a relevant peer group be publicly traded companies to an idea that is not yet even an established company? How would that logic work? The reason for that is that there is no data on privately held companies. So you have to do public comparables because if you don't do public comparables, there are no comparables where you have the detailed financial statements that are contained in the securities reporting. Now, the private transactions was the third thing that the legacy report does. And in that regard, you're looking at privately held companies and smaller and smaller companies than the public held. But what they're looking for is substantiating certain aspects of the business model and figuring out the multiples at which these companies trade and figuring out what the appropriate discount rate is. Now, we had, of course, Marianne Van Meter's company, Legacy Capital. They do transactions like this all the time. They're not a professional expert witness firm. They do what they do on the ground every day when they're valuing businesses. And then you had McCann, and McCann was a Ph.D. that has testified a great deal. He is an expert witness and a very good one. So the idea of it was we were going to combine these things, all of which to substantiate the lost business value in this case. And we think that that should be, you know, it seemed to me to be very solid evidence of value that should have gotten by the speculativeness standard, in my opinion. There's also a good bit of independent pro formas and financials that are in the records of this case, including pro formas and financials that were used by the defendants themselves to evaluate this project. And they also bear upon this value and substantiate the idea that the project had value. None of them are as detailed as the Legacy report. None of them are as detailed as the McCann report, but they bear upon that as well. All of those things go to establishing the business value. So, you know, my thinking on it was that we had a very solid lost business value damage estimate. And we chose lost business value as opposed to lost profits for the very reason that is outlined in some of the case law, specifically that when the district court said that this was a distinction without a difference, the cases don't say that. They say this is a difference that makes a difference. It's inherently less speculative, says the Schoenfeld case. The basic idea of it is that businesses are traded all the time. Their business startup businesses are traded all the time. And they're traded based on the idea that what a willing buyer will pay a willing seller at that time for the chance to make the speculative profits. So the point is that if you have a lost profit analysis, you would need to be able to say, okay, we're going to earn this amount of income in this month. It's the cost of that. It's going to cost us this much in this month. If we have a project, it's going to be completed on this time frame. If the project is going to cost this much, it's going to be completed for this much. All of those things have to be estimated. You have to have a very detailed crystal ball. And if any of them are wrong, then the ultimate lost profit number is wrong. Lost business value isn't like that, because what you're valuing is what somebody would pay for the opportunity to take those risks. And that is a real distinct difference, a very meaningful difference in this case. And that's what the — and the other thing that I wanted to make sure that I said while I was up here was that the Phillips case, I think, speaks directly to this point, because it says the law need be no more skeptical than the market itself is. And in this case, we had Stone Peak. And Stone Peak was — had about $1.6 billion in capital. They had deployed about $500 million or so of it. They had $1 billion available. Their board was — included Forrest Wiley, who was the chairman of Buckeye, which was in this exact business. They were excited about this business. They went to Texas and met with our guys several times. They took these pro formas. They did sensitivity analysis on them. And if you read the Luke Taylor testimony, they said they were very interested in this prospect. Okay, it's not exactly what we had in Wellogic. It's not exactly what we had in Phillips. But it's awfully close, and there are other corroborating circumstances, I think, that carries it — easily carries it across the line. So with — While you have time, I'll use the word disparity. You may want to use a different word. In terms of the number of acres that were going to be involved, the numbers seem to be pretty dramatic in terms of whether it was a small amount of acreage or a much larger one. Yeah, that's one of the many factual issues in this case. The evidence on that issue is that at the time that they were talking to the people at the Louisiana Sugar Refinery about this project, they had six or seven acres themselves, which included the important component, which was the deepwater dock that was kind of unique to this particular property and wasn't something that was widely available. They also had neighbors that they said that they would be able to deliver their property and help make the acquisition of that property. So on the ground at the time, it was never that much of a concern. And there's summary judgment evidence — that's the subject of a different summary judgment — on that point that substantiates the idea that getting the rest of the land, which was basically rural land that's a little bit away from the river, wasn't going to be a problem. Another, what, 134 acres or so? Something in the neighborhood of 100 acres. And ultimately, they got that land later after all of this occurred. So it wasn't something that was impossible, and it was something everybody was planning for and had a plan to get. All right, thank you, Mr. Swanson. You've saved time for a follow-up. Thank you. Mr. Benhart. Good afternoon, Your Honors. May it please the Court. I understand from Mr. Swanson that plaintiffs are not claiming any form of lost profits, and they're claiming only lost business value. What they say is that their argument, as I understand it now, is that the offer from Stone Peak takes this out of the lost profits world and puts it into something different entirely. It does not. In fact, the Stone Peak term sheet expressly reflects the same uncertainties that Judge Englehart referred to in granting summary judgment. Because it's only two pages long, it's in the record at 18,032 and 33, and it lists preconditions to closing. The preconditions to closing are the same uncertainties that Judge Englehart relied on. Stone Peak made it quite clear here, unambiguously, that it wouldn't invest any money, none, until these things occurred. There were a minimum level of take-or-pay contracts signed. It's undisputed that none were ever signed. That there was a financial close of third-party debt financing. None of it was ever closed. That all non-discretionary permits were attained. None were. That the right-of-way for the land was obtained. It wasn't. That there was a third-party engineering approval of the design, the construction budget, and the contracts, and that didn't happen either. So unlike in Phillips, where there was an actual offer that was not contingent on all of these things, here the only claim to financing was expressly contingent on that. So Judge Higginson, along the lines of the questions that you had asked, under Phillips, you still have to go through the reasonable certainty analysis here. The other two cases that plaintiffs rely on that are most comparable that involve offers were Willogic's, a case from this court, and the Schoenfeld Court, a case from the Second Circuit. In both of those cases, there were actual investments. In Willogic's, a venture capital firm had actually paid $8.5 million so there was a basis to invest. The post-Phillips Texas court opinions, have they always required it to be an actual offer? They do not say it always requires it to be an actual offer. All the cases are quite clear that this is very fact-specific, but what they all say is that there has to be some basis for reasonable certainty. The real difficulty, you heard from me in the questioning, is without any testing or discussion of the legacy report, how doesn't that alone, a 70-page damage expert, create an issue of fact? Let me address that head-on. First of all, Your Honor, we do have a pending Daubert motion to exclude the expert on legacy. The district court found it unnecessary to reach that because even taking the facts in the light most favorable, he found it was still uncertain. So that's preserved. You assume it's admissible for purposes of assessing this summary judgment? Yes, you assume that they could testify to it, but assuming that it's admissible does not mean that it's sufficient as a matter of law. Those are two different things, and that's fully preserved. Here's the fundamental problem with the legacy analysis, and that is the legacy analysis simply assumes that all of these uncertainties are covered. And, Your Honor, when you go to the part where you see what the comparables are and the analysis that goes through, legacy specifically says repeatedly, multiple times, that the financials it's using for plaintiffs, as the assumption, are the projections in 2020. It's not using current financials for when the breach occurred. It's using projections for 2020. So it just assumes past all the uncertainties. That's the fundamental flaw in that. And legacy, the expert, doesn't testify and doesn't give any independent basis saying, yes, I, the expert, legacy capital, am confident that all of these things would have happened. They don't say that. They are directed to assume that they had happened and then make the preparation based on that. That's the problem there, and that's why it doesn't create any issue of fact. There's nothing to close the uncertainties that Judge Engelhardt pointed to. And to this point, Phillips is quite clear and holds very clearly that regardless of whether you're asking for lost profits straight up or whether you're using a projection of them to calculate lost value, the analysis is exactly the same. Okay, but some of the uncertainties he points to to defeat the lost profits analysis, like the volatility of the oil market in the future, would have no relevance to an at-the-time assessment. No, I disagree, Your Honor. I disagree with that because, and let me explain exactly why. The fact that oil markets were volatile is something that everyone knows. You know, what he refers to later saying, actually their experience proved that they were volatile, yes. Hindsight does show that. But the actual fact that they're volatile is something that everybody knew at the time and was relied on. And counsel for the other side said that, you know, the difference between a lost value and lost profits is that lost value is made at one point in time and doesn't require rejection. Phillips, the Texas Supreme Court, specifically rejected that analysis in its footnote on this. It pointed that out from Schoenfeld. That's where that case came from, and it's at page 280, note 41. The Texas Supreme Court, they rejected that idea, that just the nature of it being a single point in time matters. So that can't be relied on. That's just out of play. And like I said, and their logic is very clear. Why would you just declare that you can do something through lost value that relies on profits that you couldn't do by asking for profits directly? If anything, it magnifies uncertainty because value is a multiple of profits and you're basically leveraging your uncertainty. So that's the law in Texas on here. And when you go back to the things that the judge relied on, you know, he points out their status as brand-new entities. This is page 3 and 4 of his opinion in the record. Their questionable ability to finance the project, which I've mentioned Stone Peak was expressly contingent on all of these uncertainties. Their lack of permits is what he points to. He does point to the volatility in the market, which Mr. Goitea himself referred to as one of the principal uncertainties. You know, and just to be clear here what was going on, the reason this was so novel is that this was the first time that a party that didn't own either the railroads or the oil was trying to build this kind of terminal. And that was unusual because the problem with this terminal is it depends on a spread between the price of Canada and Gulf Coast crude. The spread has to be big enough to cover the transportation costs. Everybody agreed with that. That's what Mr. Goitea pointed out in his analysis. Everybody knew that the prices could fluctuate so the spread wouldn't already exist. So what do you do with the uncertainty? Well, if you're an oil company or a railroad company, you can float the uncertainty because you have the other assets and it's a hedge. But if you don't have those other things, you've got to shift the uncertainty to someone else. That's why Mr. Goitea testified, and it's undisputed, that in order to make this work, they had to have take-or-pay contracts for five unit trains of oil on a basis to shift that uncertainty so that somebody else, the customers, would bear the risk of price fluctuations. Otherwise, if the price fluctuated, they'd stop using the terminal, you'd lose a bunch of money. So when the district court pointed out that there is the uncertainty of securing sufficient take-or-pay customer agreements, that's exactly the uncertainty that exists in here, and it's the uncertainty that Stone Peak also said. They said, we won't invest until you close that gap. Legacy Capital assumed that they had closed the gap, but they have no factual support for that. And they don't claim it. They were told to assume it, so they did. That's the problem on there. The other, Dr. McCann, makes exactly the same assumption on this. And let me just, I want to be clear about the fact of where this assumption is. In the legacy report? In the legacy report. Because when they, Judge Engelhardt, you gave Judge Engelhardt no responsive argument on the invalidity of the legacy report, correct? Well, we have an entire Daubert brief on the invalidity of the legacy report. There's no evidence that he incorporated that at all. No, I don't, he doesn't refer to the Daubert briefing in this. He does refer to these undisputed uncertainties. And like I said, so I'm going in here. The legacy report on here is 1926 is where it is, 1920 through 1926, or 16,000, 1926, in that range is where the legacy report is. It's around pages 20 to 23 of that. And I can just stand it here, for example, to make it clear where they're making these assumptions on this, because they do it multiple times. So I'm looking at now, they start, it's page 20 of the report. It's record 16,000, 1922. They say they're doing these assumptions, and so they're just assuming that this is fully operational in 2020. All the debt has been paid off in there. And the specific list of things that they assume is on page 16,925. They assume the lease was signed for the land. They assume that it obtained the permits, the customer contracts, the construction contracts, and the financing sources. They assume it got operational. They assume the debt got paid off. You're looking at it. All three models rest on those assumed contingencies? Yes. So am I oversimplifying to say your answer to the legacy report is not that they forfeited it, which at least existed in your brief. It's that if you look at it, it's as defective as the Stone Peak proposal. Yeah. The core point is that, yes. The forfeiture point related to just one of the models within there. But go to the root cause. To take this out of just the pure lost profits, which I understand they're not pursuing, and to take this into an actual offer to buy. The only link there is Stone Peak. That's the only thing that would change this. Our argument is that Stone Peak, record page 18,032, lists all of these same uncertainties as conditions precedent. And the testimony of Luke Taylor. Luke Taylor was the corporate representative for Stone Peak who testified on this. And his testimony on that, and it's pages in the record, 13,439 through 54 is the place where it's most categorized together. So, again, 13,439 to 54. He went through and said, yeah, these conditions are real. They hadn't investigated whether plaintiffs had financing. They said, we're going to rely on our condition to make good. They hadn't investigated whether they had engineering. They were relying on their condition to make good. They hadn't investigated whether they had customers. They were relying on the conditions to make that good. So Stone Peak reinforces the uncertainty. It doesn't undermine it. What Stone Peak shows is that a real sophisticated investor, like they say it is, a real sophisticated investor doesn't put any money into this until these uncertainties are closed. And it's undisputed they weren't closed. Go ahead, Your Honor. It's a difficult case. The question that does come to mind, since you prompted me, is that am I wrong that the legacy report discounted for the contingencies but still came up with a valuation? That's one. And then two, would no reasonable juror be able to infer from Cargill's own statement that it wanted to invest that there was some value, at least to get past summary judgment? Let me answer both of those. First of all, you're correct that legacy does a discount. Simply discounting, though, does not answer the predicate question of whether it's certain enough at all that the law will allow it. An actual offer. It can't be that for a new business there has to be an actual offer, right? No, you're right. Where's the line between too contingent to allow for summary judgment, the question of damages stops the case, as opposed to, and we've got an expert that's going to willingly discount and show you there's still value? Yeah. The cases they cite on discounting, by the way, none of those address the predicate requirement of whether it's certain enough under Texas or Louisiana. They just say is the discount right? And the cases they have, they're breach of like a supply contract for 15 years. There's no uncertainty at all in whether it's going to happen. That's just discounting the future value. Those cases are completely on opposite. So let me say that Phillips, I think, is the guiding principle. So here's the list. They say here are the things that make it too uncertain. An activity dependent on uncertain or changing market conditions. Check. Chancey business opportunities. Brand new thing nobody's ever done before. Check. Entry into an unknown market. Again, new third party. Check. Success of a new or unproven enterprise. Check. And just let's go through the cases that we have. Here are the cases that they've said enough. Phillips. There's an actual offer by the defendant. It was a confession by the defendant. The court said this is omission. Wilogics. An actual investment by a venture capitalist. They cite that. Nola Ventures. This case from the Eastern District of Louisiana. This was the destruction of two Arby's that were in business. So you had a track record there. There was also an offer to buy, but they didn't business. You know exactly what they meant. The Eatery's case from the 10th Circuit. It was a chain of restaurants that had been in existence, and there was an offer that the district court made a finding of fact that it would have closed but for a salmonella incident caused by the defendant. So there you had a track record of existing businesses plus that. Schoenfeld. Actual broadcasting contract with Cox Communications for the BBC Network. Again, the defendant had signed on to it, so there's confession by the defendant. Checker Bag. It was an existing cotton candy business. Perfect. It was an existing rental building. Those are the cases they cite that's enough. So here are the cases that we've cited that says it's not enough. Texas Instruments. They're developing a new voice-controlled thermostat. George Gehrig. They're negotiating to get a new freight route. They got it. Court found it wasn't certain enough even for that. Schwamm is a Louisiana case. It was a developer who had bought 400 acres. They already had the land as opposed to here, and they found it was still uncertain because there's no construction. Roars. It was an actual business. They said an offer two years down the road wasn't enough to make it certain in 2003. C.Q. King. We cite all these cases. I've got to tell you, when you line up the string of cases that say not certain enough, cases that say absolutely certain, this case is down here with about six that have found insufficient certainty higher. Yet all of these cases are either summary judgment or judgment as a matter of law. They say it works. Expression of interest to invest. Phillips addresses that, too, because the plaintiff, I think it was the plaintiff there, had made the same argument on saying the expression of interest is enough, and they said, no, actually I'm wrong. It's the Texas Instruments case because their Texas Instruments has said, yes, we're interested in this thermostat. The court says, as a matter of law, it's not enough that you're interested. You've got to go beyond interest to investment. And let's make it clear what happened here. The defendants here never put a dime into this. There isn't anything here that's like Phillips or Wologics or anything like that where there's an admission for a defendant. The only hook is Stonepeak, and Stonepeak, as I said, reinforces the uncertainty by making it contingent on the very same things. There just isn't any easy way around. There isn't any legal way that you can say, we don't have to care about the undisputed uncertainty. Let me just say, why is it undisputed? It's undisputed that they're new entities. Yes, they were formed in March or April or May of 2013. They started talking with defendants here in August of 2013. Discussions broke down by January. It was a four-month period. They were only eight months old when it ended. They were only two or three months old when it started. There's no dispute about that. This is the first third-party terminal of any kind that's undisputed because Mr. Gautia, their principal, testified to it. It's in the record at 8555 and 56. Does this depend on the market spread and crude, and is it subject to volatility? Yes, because Mr. Gautia, again, put it in his investment form. That's in the record at 7984. Is it undisputed that they had no customer commitments and no contracts? Yes, because he agreed to that too. The question for Mr. Swanson, if he comes up here, is, is there any actual dispute about any of those sources of uncertainty? The answer to that is no. If he agrees to that, no. Does Stone Peak wash that out? Do they say that they're going to invest regardless of those uncertainties? The answer to that is no. Then what closes the gap? And if it's legacy, Your Honor, then you go to the page in legacy. Let's turn on that statement for your reference to legacy. And then you go to legacy and you say, did legacy fill the gap? Did they make it less certain? Did they say, oh, no, they were going to get the customers, they were going to get the railroads, they were going to get the permits, they were going to get all that? Does legacy testify to that or do they assume it? If the answer is they assume it, they don't help at all to close the factual uncertainty. They just do the math at that point. And as maybe it's Your Honor, one of Your Honors pointed out, there's one difference between plaintiffs here and all of the comparables in legacy that makes them incomparable in the extreme, and that is this business didn't have anything. No history, no profits, no contracts, no land, no terminal, no nothing. Every one of those businesses had those things. And the main point of the comparable analysis, this is this Court's Lerman decision that's in the briefs, the plaintiffs cite 500 fed second at 667. Here's the rule when you do a comparables analysis. The business used as a standard must be as nearly identical to the plaintiffs as possible. Legacy compares what they projected based on their assumptions this business would be in 2020. It assumes away all the uncertainties, and then it compares that to the existing business. We've got some work to do because that wasn't presented to the district court and he doesn't address it even in the final footnote. But I see your point. It's there in the record. We have to do that work. Yeah, you know, and what I say, Your Honors, the district court wrote a five-page opinion on this. He could have written a 20-page opinion. The pages that address this, those list of uncertainties, all of them are undisputed. None of them are cured in any of these places, and that's the reason it was entirely correct. All right.  Let's take time for Guttel. You know, I would dispute everything that he was just saying about the facts of this case, and I'll see if I can give you a little bit of an understanding of what I think the record discloses here. The record shows that up until around the beginning of January, the parties were working constructively together and a lot of work had been done on this project. And then the defendants decided they were going to do the project themselves and they lost the ability to do the project at this dock at that point in time. So we were prevented from doing all of the things that would be necessary to have finalized some of these items he's talking about, and that creates the uncertainty. Do you then agree that legacy was only assumptions? No, I don't agree with that, and that was what I was about to get to, Your Honor. The fact of the matter is on every bit of this stuff, if you look at our brief here in the Court of Appeal and if you look at the briefs that are filed in the trial court, and they're even more exhaustive and more detailed on this, with respect to every point we can demonstrate, you take, for example, they say there was no engineering drawings. Well, the engineering has gotten pretty far along and we had a not-to-exceed bid for this project for the engineering. For example, the permits. Yes, we hadn't issued a permit because we needed to have the dock and be able to write it onto the permit form to get the permit, but there had been a lot of work done by high-paid consultants on the permitting process, and there's testimony in the record that establishes they believed there was going to be no problem with the permitting. With respect to the customers, there's a lot of evidence in that record on the fact that there were customers that were very interested in this project. And Luke Taylor himself testified in his deposition that you wouldn't expect that you would have signed customer commitments until such time as you had the location. So you couldn't get them to sign for the take-or-pay until you knew exactly where the facility was. But all of that was very far along. Is there evidence for a reasonable juror to think that but for the alleged misconduct, the conditions would all have been fulfilled? Yes, there is evidence on every single one of those points in the record that establishes that absent the defendant's misconduct, this all would have taken place and could have taken place. What about just a separate point that if we disagree that there is a debatable evidence on that, did the legacy report assume the conditions when it gave valuation? Did it assume, is he correct on that statement, that all its models assumed that those conditions would be fulfilled? If you look at the deposition of Mary Ann Van Meter, which is attached to the Daubert motions on the subject, you will see that she went back and made an attempt to verify every single factual thing that she was under — that was included in her report, and that she was confident that those conditions could be met. So when you say assume, no, she did not just take what somebody told her was an assumption and run the numbers like this gentleman just said. No, she made an attempt to verify all that, and it was her firm opinion that all of it could have been done. And in the legacy report, the thing they don't mention is that there is a discount rate applied to this, which is a 25 percent discount rate, and it's broken down into different components. One of those components are specific business risks that were facing this specific business. A 25 percent discount rate is a very hefty discount rate, and it reflects the fact that, okay, maybe 18 months, maybe it wouldn't have taken 18 months. Maybe it would have been 19 months or 17 months. But all of that was built in and accounted for in both of those expert reports. So what you have is you have a voluminous record here that shows everything that was done, and they make it sound, I think, a little like there was not very much done, but if you look at the record, there was very much done. Was there a motions hearing where you both made these competing arguments about these expert reports? Yes, there was a Daubert motion on the— That didn't happen, the summary judgment motion hearing. Yeah, but there was a filed Daubert motion, so they're in the record. They're in the record. My point is in order to rule in summary judgment, were you two able to bolster or discredit these expert reports before the district judge? Well, they were referred to, of course, in our motion papers. Yes, that's what I'm trying to ask. But we didn't have an oral argument on it, so we didn't know exactly what concerns the judge may or may not have had at the time. But all of that is set forth and attached to our motion papers here. So when they say this wasn't argued below, well, that's, I mean, that's definitively false. I don't know how else to say it. It's definitively false. All right. Thank you, Mr. Swanson. Thank you all very much. Based all of today's cases are under submission, and the Court is in recess until